UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Jesse Huset,<br><br>Plaintiff,<br><br>vs.<br><br>City of Roseville, et al.,<br><br>Defendants. | Case No. 05-295 (DSD/JJG)<br><br>PLAINTIFF'S MEMORANDUM OF LAW OPPOSING SUMMARY JUDGMENT |

---

TO: The Court and Defendants and their attorneys Joe Flynn, Esq., JARDINE, LOGAN & O'BRIEN, PLLP, 8519 Eagle Point Boulevard, Suite 100, Lake Elmo, Minnesota 55042.

This memorandum of law is submitted by Plaintiff opposing Defendants' motion for summary judgment.

## INTRODUCTION

William Pitt, Earl of Chatham, in a speech in 1766, stated most eloquently the bed-rock principle that:

> "The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter; all his force dares not cross the threshold of the ruined tenement!"

Pitt's statement has been quoted by the U.S. Supreme Court in emphasizing the sanctity of the home and how important that is to the concept of order liberty. See Payton

v. New York, 445 U.S. 573, 601 n.54 (1980); see also Miller v. U.S., 357 US 301, 307 (1958). The Minnesota Supreme Court has similarly relied on Pitt's passage to remind us that "[a] man's right to occupy his home is inviolable." Thiede v. Town of Scandia Valley, 217 Minn. 218, 225-26, 14 N.W.2d 400, 405 n.2 (1944); see also State v. Larsen, 650 N.W.2d 144, 147-48 (Minn. 2002) (quoting Pitt and stating that the right to be free of unauthorized entry into one's home is "ancient and venerable.") In short, the 4th Amendment of the U.S. Constitution, as well as its counterpart in the Minnesota Constitution, are but reflections of the maxim that "a man's house is his castle." See Payton, 445 U.S. at 596-98; Thiede, 217 Minn. at 225-26, 14 N.W.2d at 405.

So, too, in Huset's case do the same principles act as the cornerstone of his claims. In this case, Roseville police, without consent, a warrant, or probable cause and exigent circumstances, forced their way into Huset's apartment, used excessive force in barging into the apartment, conducted an illegal search, and when Huset objected to being removed from his apartment - - he was not formally under arrest at that time - - used excessive force in arresting him for what the officers perceived to be obstruction of justice. Huset brought suit for violation of his constitutional rights, including excessive force, and common law assault and battery. Defendants now move for summary judgment and Huset opposes the same.[1]

---

[1]To assist the Court narrowing the issues, Huset agrees to drop his claims against the City, e.g., Count II - Canton/Monell claim, as well as Count III, conspiracy; Count VI, negligent infliction of emotional distress; Count VII, invasion of privacy; Count VIII,

## FACTUAL BACKGROUND

Jesse Huset

On December 31, 2003, Huset held a New Year's Eve party at which he and several guests played cards, listened to music, talked and danced. [Huset Depo. at 20, 33]. Although he admittedly supplied alcoholic beverages, Huset denies knowing if anyone was under the age of 21. [Huset Depo. at 23 , 24].

At about 12:30 a.m. on January 1, 2004, the police were knocking on Huset's door. [Huset Depo. at 34]. Huset opened the door, saw it was the police, and apologized for the music, stating that he had already turned it down. The police responded that that was why they were there. [Huset Depo. at 34-35]. Despite having the music turned down, the police then told Huset to "let us in," but Huset denied their request; the police asked another time or two, and each time Huset refused to consent. [Huset Depo. at 36]. Huset does not recall that the officers stated why they wanted to come in, and he told them that they had no reason to come in. [Huset Depo. at 36].

Despite Huset's refusal to consent to their entrance, Officer Jorgenson nonetheless reached his hand through the door, across Huset's chest, and threw Huset into the closet adjacent to the door. [Huset Depo. at 36]. The way Huset describes it, Jorgenson planted his hand on Huset's chest and threw him out of the way. [Huset Depo. at 38]. Huset says

---

aiding and abetting tortious conduct; Count IX, false arrest; and Count X, false imprisonment;.

he was slammed into the closet door. [Huset Depo. at 38].[2] After being thrown into the closet, Huset took some steps backward, but was shoved again by Jorgenson a total of approximately three times. [Huset Depo. at 45-47]. Each time Jorgenson pushed him, he pushed Huset on the chest, with each push hard enough to cause Huset to fall back one or two steps. Jorgenson pushed Huset until he reached the living room. [Huset Depo. at 46-47].

Once they were in the living room, the police officers took Huset's identification, and proceeded to line up the other guests, asking them for their identifications and ask who had been drinking. [Huset Depo. at 51-52].

Although Huset admits to being upset, he denies ever acting out of control. [Huset Depo. at 53-54]. He never made any attempt to block the officers from moving around the apartment. [Huset Depo. at 54].

At some point, the officers asked Huset to move from the living room so that they could talk with him, but the officers did not specifically say where they would go. [Huset Depo. at 54]. The officers simply commanded Huset to "come with us." [Huset Depo. at 54]. Before he had any chance to respond, Jorgenson grabbed Huset by the sweater and started pulling him; Huset describes the way he was pulled as if he was a dog being led on a leash; after grabbing him by the collar, Jorgenson led Huset from the living room into the kitchen. [Huset Depo. at 55-56, 58].

---

[2]Huset identified Jorgenson as the one who pushed him. [Huset Depo. at 44-45].

Once he got to the kitchen Huset became increasingly scared and denies taking a fighting stance. [Huset Depo. at 68, 79]. When Huset realized the officers wanted to take him outside of the apartment, he stopped and refused, stating he would answer their questions right there. [Huset Depo. at 55-56]. In particular, Huset told the officers he was not comfortable going outside, that he preferred not going in the hallway. [Huset Depo. at 56-57].

When Huset stopped moving, Jorgenson let go of his sweater. Jorgenson said, "lets go, get out in the hallway." Huset again said no. [Huset Depo. at 58]. According to Huset, Jorgenson then "flipped" and threw Huset across the kitchen into the dining room. [Huset Depo. at 58-59]. Huset was thrown so hard that his feet left the ground. [Huset Depo. at 60]. Huset said it felt like he was blind-sided, as if being tackled in football. [Huset Depo. at 61]. Jorgenson then jumped on top of Huset and cuffed him. [Huset Depo. at 58-59].

When Jorgenson demanded that Huset go into the hallway, Jorgenson kept rising his voice with each command. In response, Huset denies raising his voice when telling him that he did not want to go into the hallway, that he could answer questions right there. [Huset Depo. at 59]. Huset says that nobody had told him that he needed to calm down. [Huset Depo. at 67].

Before being thrown into the dining room and handcuffed, Huset says that he was not warned that he was under arrest, nor that he was going to be put under arrest. [Huset

Depo. at 62].

Huset was taunted by Jorgenson, who told him that he needed to grow a few inches. [Huset Depo. at 63]. The officers told him "we are going to give you a lesson in law." [Huset Depo. at 74].

Huset spent a little over two days in jail. [Huset Depo. at 65]. The original charges against him were dismissed. [Huset Depo. at 66]. Also, he later received a ???-charge in the mail from Jorgenson for public nuisance. That charge was also dismissed. [Huset Depo. at 66].

Officer Perkins

Rather than repeat Officer Perkins' narrative about what transpired from his point of view, Huset refers the Court to Officer Perkins' two police reports. [Swanson Aff., Exhibits H, J].

Office Jorgenson

Huset refers the Court to Jorgenson's reports for his primary description of what transpired from his point of view. [Swanson Aff., Exhibits G and I]. Nonetheless, some of the more pertinent points of Jorgenson's testimony are worth noting herein.

Jorgenson agrees that probable cause is more than a hunch or a guess. [Jorgenson Depo. at 10]. He also concedes that an officer needs consent to enter a person's apartment or that some other exception to consent must exist. [Jorgenson Depo. at 11]. In other words, Jorgenson concedes at one point that absent consent (and presumably absent a

warrant), he needs both probable cause and exigent circumstances to enter a home. [Jorgenson Depo. at 14]. Incredibly, however, at another point Jorgenson seems to think that as long there are exigent circumstances, an officer does not even need probable cause to enter one's home. [Jorgenson Depo. at 12-14].

Jorgenson defines exigent circumstances as fleeing suspect, destruction of evidence, and hot pursuit, and further acknowledges that officers are required to know what exigent circumstances are. [Jorgenson Depo. at 13].

On December 31, 2003, Jorgenson was called to Huset's apartment to investigate a noise complaint. There had been no report of underage drinking. [Jorgenson Depo. at 17]. He admits that Huset was not a suspected fleeing felon, nor was there any hot pursuit, or an emergency situation. [Jorgenson Depo. at 17].

It is undisputed that he did not have a warrant to enter Huset's apartment or to arrest Huset. Similarly, Huset did not consent to Jorgenson's entry to his apartment. [Jorgenson Depo. at 19].

Upon arrival at Huset's apartment, the officers knocked several times on the door, and when the door was answered by Huset, the music was turned down. [Jorgenson Depo. at 23-25]. Jorgenson told Huset that they were there about a loud party complaint. [Jorgenson Depo. at 28]. Although he could hear other people in the apartment while standing at the door, Jorgenson could not see other people when Huset opened the door. [Jorgenson Depo. at 28-29]. All Jorgenson could see when Huset opened the door was the

hallway into which it opened. [Jorgenson Depo. at 29].

Jorgenson states that he typically writes his police reports on the night of an incident because his recollection of facts is better the closer he writes the report to the event. Importantly, nowhere in his initial report does he mention seeing a male and female walk across the hallway carrying what purported to be an alcoholic beverage. [Swanson Aff., Exhibit G]. Yet Jorgenson now says that he not only saw two people in the hallway behind Huset walking from the bathroom toward the living room, but also that in the second or two that he saw them he could see they were carrying bottles with an alcoholic beverage, despite not being able to exactly see the bottle labels. [Jorgenson Depo. at 30-33; Swanson Aff., Exh. I]. Importantly, Jorgenson's supplemental report [Swanson Aff., Exhibit I] from October 2004 was written after he had been informed that there might be a lawsuit pending by Mr. Huset. [Jorgenson Depo. at 80-81].

Jorgenson further testified that he suspected, based on their appearance, that the two individuals who walked behind Huset for not more than one or two seconds were underage. [Jorgenson Depo. at 34]. Jorgenson admits that the two persons walked by within seconds of Huset telling him that he would turn down the music. [Jorgenson Depo. at 35].

Jorgenson also states that at some point he heard someone say "oh shit, it's the cops." He also says he heard clanging and some sort of commotion. [Jorgenson Depo. at 36-37]. At that point, Jorgenson told Huset that they needed to come into his apartment,

but Huset said he could not. [Jorgenson Depo. at 37]. Jorgenson repeated that he needed to enter and Huset again said no. [Jorgenson Depo. at 37]. Jorgenson admits he used his hands to push Huset away from the door, [Jorgenson Depo. at 37] placing his hands on Huset's shoulder and grabbing him. [Jorgenson Depo. at 37-38]. As he did that, Jorgenson was entering Huset's apartment. [Jorgenson Depo. at 39]. Jorgenson admits, that Huset may have gone into the closet doors adjacent to the front door. [Jorgenson Depo. at 43]. Jorgenson also admits pushing Huset while he was in the apartment, moving Huset backwards. [Jorgenson Depo. at 40-41]. Jorgenson says that Huset then led him into the living room, and that he did not again touch Huset from the time he entered into the living room until Huset was formally arrested. [Jorgenson Depo. at 42-43].

Once in the living room, Jorgenson asked for the party-goers' identifications, including Huset's. [Jorgenson Depo. at 43-45]. Two of the party-goers ultimately admitted that they were underage. [Jorgenson Depo. at 46].

Jorgenson says that while he was in living room, Huset was argumentative and loud, that he took a combative stance and attempted to approach Jorgenson. Jorgenson says he told Huset to calm down. [Jorgenson Depo. at 45-47].

Jorgenson then asked Huset to step away from the other guests into the hallway and that Huset voluntarily went with him. [Jorgenson Depo. at 49]. Jorgenson denies grabbing Huset at this point. [Jorgenson Depo. at 49]. They never made it to the apartment building hallway because Huset stopped. [Jorgenson Depo. at 51].

Jorgenson contends that as the were approaching the hallway, Huset turned, clenched his fists and partially raised them, with his arms bent at the elbow. [Jorgenson Depo. at 52-53]. Jorgenson told Huset that they need to go into the hallway five or six times, and Huset told him that he was not going and that Jorgenson would have to throw him there. [Jorgenson Depo. at 53]. At that time, as Jorgenson grabbed hold of Huset to physically escort him into the hallway, he claims Huset physically resisted and tried to punch him. [Jorgenson Depo. at 54-55].

Jorgenson took Huset to the ground to control his movements and placed him under arrest. [Jorgenson Depo. at 56-57]. After Huset was taken to a squad car, Jorgenson went back and took photographs and then escorted the two underage party-goers outside. They were given portable breath tests and issued citations for underage drinking. [Jorgenson Depo. at 65-66].

While Jorgenson says that it is a misdemeanor offense for minors to consume alcohol, he admits that minors may legally be around alcohol. [Jorgenson Depo. at 70 and 72]. The reason he entered Huset's apartment was to investigate underage consumption and because of what he called "exigent circumstances." [Jorgenson Depo. at 75-76]. The specific exigent circumstances Jorgenson mentions are his fear of destruction of evidence and that people would try to escape. [Jorgenson Depo. at 77]. Jorgenson says that Huset was detained and not free to leave almost immediately upon his entry into the apartment, and justifies that entry and detention so that he could investigated possible

numerous crimes, including a noise violation and providing alcohol to minors. [Jorgenson Depo. at 58]. Other crimes Jorgenson mentions to justify his warrantless entry are failure to obey a lawful order to accompany Jorgenson into the hallway and, perhaps most incredibly, failure to obey a lawful order of allowing the police officers into the apartment in the first place. [Jorgenson Depo. at 58].

Melissa Witt

Melissa Witt was at the New Year's Eve party, heard knocks on the door, and recalls that someone said something about the police being there. [Witt Depo. at 10-11]. Once the party-goers realized the police were at the door, Huset went by himself to open the door and everyone else remained where they were, which was away from the front door. [Witt Depo. at 12-13]. Witt was in the area between the kitchen and the dining room, with Ms. Keen. [Witt Depo. at 14]. After the front door was opened, she heard the police tell Huset that they were there about the loud music. [Witt Depo. at 11]. The music was turned down or off once they realized it was the police at the door. [Witt Depo. at 12].

Although she could not hear what exactly was being said between Huset and the officers at the front door, she heard a loud banging and saw Huset being pushed up against the closet doors, with an officer's hand on Huset's chest. [Witt Depo. at 16-17]. The officer then pushed Huset into the living room using both hands against Huset's chest. [Witt Depo. at 18]. Although Huset did not fall down, he did walk backwards into the

living room. [Witt Depo. at 19-20].

At some point, after being asked for her identification, Ms. Witt had to go to the bedroom to retrieve her identification, and one of the officers followed her. [Witt Depo. at 22]. When she obtained her identification and walked back into the living room, she recalls an officer grabbed Huset by his shirt and dragged him away from the others. [Witt Depo. at 22].

Witt remembers that the officers taunted Huset, saying "looks like someone needs to grow a few inches." [Witt Depo. at 29]. Witt further recalls that Huset's demeanor was calm during the entire incident, not confrontational or mad. [Witt Depo. at 30].

<u>Patrick McGregor</u>

McGregor admits that he was underage and consumed alcohol at Huset's party. [McGregor Depo. at 7]. When the police arrived at Huset's apartment, there was loud music being played. [McGregor Depo. at 12]. McGregor could not see the officers at the door, but did see Huset go to answer the door. [McGregor Depo. at 13].

After rounding up all of the guests and asking for their identifications, Huset told the officers that they had no right to be there. [McGregor Depo. at 17]. The officers told Huset that they wanted to talk to him, away from the other guests. [McGregor Depo. at 17]. When Huset was taken to the front door area, the other party-goers simply sat in the living room. The next thing McGregor knew was that Huset "flew" across the kitchen and into the dining room. [McGregor Depo. at 18]. It appeared to McGregor that Huset had

been pushed. [McGregor Depo. at 23]. The officers then tackled Huset to the ground, pinned Huset there and handcuffed him. [McGregor Depo. at 18-19]. The officers then made a comment about Huset's height and called him a "little rock star. " [McGregor Depo. at 19].

Although McGregor says that Huset was angry, he does not feel that Huset was trying to act tough in front of his guests. [McGregor Depo. at 38].

Adrienne Keen

Ms. Keen was at Huset's New Year's Eve party on December 31, 2003, where there was music being played and some dancing. [Keen Depo. at 7, 18, 55]. Despite being asked many ways by opposing counsel, Ms. Keen denies walking from the restroom toward the living room when the police officers arrived at Huset's apartment. In other words, she denies that it was she whom Jorgenson says he saw walking across the hallway with an alcoholic beverage in her hand. [Keen Depo. at 21-23, 25-27, 28-29, 32].

Keen also recalls that the officers made the "little rock star" comment to Mr. Huset, either before or after he was arrested. [Keen Depo. at 34, 50].

## BRIEF STATEMENT OF DISPUTED FACTS/ISSUES

Huset contends that there was no probable cause and exigent circumstances for the Roseville police officers to enter and search his apartment on January 1, 2004. He also disputes that the police had probable cause to arrest him, that there was ever a need to use force at any time, and that the force used against was reasonable.

## LAW AND ARGUMENT

### I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Landon v. Northwest Airlines, Inc., 72 F.3d 620, 624 (8th Cir. 1995). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the non-moving party. Enterprise Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Enterprise Bank, 92 F.3d at 747. Summary judgment must not be granted if a factual dispute is "genuine," meaning that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

The judge's function at the summary judgment stage is not to weight the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249, 106 S. Ct. at 2511. Credibility determinations, weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at the summary judgment stage. Anderson, 477 U.S. at

255, S. Ct. at 2513. The evidence of the nonmoving party is to be believed and all justifiable inferences are to be drawn in his or her favor. Anderson, 477 U.S. at 255, 106 S. Ct. at 2513.

The issue of whether summary judgment on grounds of qualified immunity is appropriate from a particular set of facts is a question of law. See Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994). "But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." Id.

## II. ILLEGAL ENTRY AND SEIZURE

Huset claims that the Roseville police officers entered his apartment illegally, without his consent, without a warrant, and without probable cause and exigent circumstances. The officers claim that the doctrine of qualified immunity shields them from any wrong doing, which they deny in the first place.

### A. Qualified Immunity

Government officials performing discretionary functions generally are granted qualified immunity and are shielded from liability for civil damages under 42 U.S.C. § 1983 insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Wilson v. Layne, 526 U.S. 603, 119 S. Ct. 1692, 1696, 143 L. Ed. 2d 818 (1999), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). Otherwise stated, an official

performing discretionary functions will generally be immune from liability unless a reasonable person in his or her position would have known that his or her actions violated clearly established law. Greiner v. City of Champlin, 27 F.3d 1346, 1351 (8th Cir. 1994), citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987).

Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. Wilson, 119 S. Ct. at 1699, quoting Anderson, 483 U.S. at 639, 107 S. Ct. at 3039. Accordingly, the determination of whether an official is entitled to qualified immunity requires a two-prong inquiry. An official loses immunity if, first, the law violated was clearly established at the time of the violation, and second, the applicability of the law to the officer's particular action was evident. Greiner, 27 F.3d at 1352, citing Anderson, 483 U.S. at 640, 107 S. Ct. at 3039.

## B. Huset's Rights Are Clearly Established

The Fourth Amendment of the United States Constitution, and Article I of the Minnesota Constitution, secures to us the right to be secure in our person and homes by prohibiting the government from unreasonable searches and seizures of the same. U.S. Const. amend VI; Minn. Const. art. I, § 10. It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.

Welsh v. Wisconsin, 466 U.S. 740, 748 (1984). The principal protection against unnecessary intrusions into our homes is the warrant requirement imposed by the Fourth Amendment on government officers who seek to enter one's home to either search or arrest. Id. It so important to our Fourth Amendments rights that courts have held that searches and seizures inside a home without a warrant are presumptively or per se unreasonable. Payton, 445 U.S. at 586; Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971) ("a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show...the presence of 'exigent circumstances'"). See also State v. Larsen, 650 N.W.2d 144, 148 (Minn. 2002) (citations omitted). The Minnesota Supreme Court has warned law enforcement and prosecutors that "this court will not look kindly upon warrantless entries of family residences, justified on the flimsiest and most pretextual of excuses. The constitutional right to be free from unjustified, official invasions of one's home is basic, and this court will not tolerate its violation." State v. Othoudt, 42 N.W.2d 218, 224 (Minn. 1992).

Huset's rights here are well established. Absent a warrant, Jorgenson needed to have probable cause and exigent circumstances to enter Huset's home without his consent.

What constitutes exigent circumstances is also clearly established. As recognized by the Minnesota Supreme Court, it has determined that exigent circumstances exist in cases of hot pursuit, danger to human life, imminent destruction of evanescent evidence, and possible flight of a suspect. State v. Paul, 548 N.W.2d 260, 264 (Minn. 1996); see

also In re Welfare of B.R.K., 658 N.W.2d 565, 579 (Minn. 2003) (listing various exigent circumstances, together with the Dorman factors[3]).

In Huset's case, it is undisputed that Jorgenson had no consent to enter his home, nor did they have a warrant. Given the facts, a fact-finder may infer that Jorgenson did not have probable cause to believe there was underage drinking. Instead, at most, he had a mere hunch, a guess, which he admits is plainly not the same as probable cause. The fact-finder can further infer the lack of exigent circumstances, e.g., no emergency condition, no pursuit of a fleeing felon, no risk of destruction of evidence, no hot pursuit, no flight risk. As result, Huset has alleged facts to show that there were violations of his constitutional rights.

## C. Objective Reasonableness

The next inquiry is whether the officers' actions were objectively reasonable in light of the law and the information they possessed at the time. Ludwig v. Anderson, 54 F.3d 465, 471 (8th Cir. 1995). To determine objective reasonableness, a court must balance the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.

[3]The Dorman factors are: (a) whether a grave or violent offense is involved; (b) whether the suspect is reasonably believed to be armed; (c) whether there is a strong probable cause connecting the suspect to the offense; (d) whether police have strong reason to believe the suspect is on the premises; (e) whether it is likely the suspect will escape if not swiftly apprehended; and (f) whether peaceful entry was made. B.R.K., 658 N.W.2d at 579 (citing Dorman v. United States, 435 F.2d 385, 392-93 (DC Cir. 1970)).

Ludwig, 54 F.3d at 471 (quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1 (1985)). At the same time, the Court must be mindful of the requirement that police officers are required to be aware of the limits placed on their actions by the Constitution. See Diloreto, 744 F.Supp. at 623; see also Tribble v. Gardner, 860 F.2d 321, 324 (9th Cir. 1988)(government officials are charged with knowledge of constitutional developments, including all decisional law).

In assessing the reasonableness of the officers actions, the court must first be mindful of the distinction between in search and seizure conducted in one's private residence and one conducted elsewhere, e.g., in public are one's office. See Payton, 445 U.S. at 587-588). It must then assess the reasonableness of the officer's actions in light of In re the Welfare of B.R.K., 658 N.W.2d 565 (Minn. 2003).

In B.R.K., there was a party at a private residence where many minors attended and consumed alcohol. B.R.K., 658 N.W.2d at 568. Not surprisingly the sheriff's department received a report that there was underage drinking at the party. Id. at 568-69. After deputies arrived, one deputy shined a light through the basement window and saw open beer bottles and hard liquor containers on the bar. Id. at 569. Based upon prior knowledge, the deputies also knew that there were firearms in the home. Id. at 569. The deputies knocked on the door, but received no answer. The deputies entered anyway, announced themselves, and searched the home; they found teenagers, who, when questioned, admitted drinking. Id. at 569. The teenagers were charged with criminal

minor consumption. Id. at 569.

The deputies justified the warrantless entry and search by testifying that they had a concern for the safety of the minors inside, citing the danger of consumption of alcohol and the possibility that one of the teenagers could get hurt if they left under the influence. Id. at 569. The deputies were also questioned about their reasons for not getting a warrant before entering and searching the home. They gave the following reasons for their failure to get a warrant: (1) it was inconvenient to get the warrant; (2) they were afraid that if they left the property to get the warrant, then they were certain that the perpetrators would have been gone by the time they got back (presumably, this was the flight risk); and (3) their concerns about the firearms (presumably, this means their concern about safety of themselves or others). Id. at 570.

Among other things, the issue the Minnesota Supreme Court addressed was whether the warrantless search violated the Fourth Amendment and whether exigent circumstances existed to justify the warrantless entry and search. Id. at 570. The court reversed and held that there were no exigent circumstances and that the warrantless entry and search was a violation of the Fourth Amendment and the Minnesota state constitution. Id. at 580.

As to the exigent circumstances, the supreme court noted that although "serious," minors drinking alcohol does not qualify as an exigent circumstance. The supreme court noted there was no indication that any of the minors were suffering from any serious medical consequences from consuming alcohol. Id. at 579. The court then applied the

Dorman factors and concluded that no exigent circumstances existed. First, underage drinking was not a grave or violent offense. Id. at 579. Second, as to threat of flight, if the deputies were concerned about that they could have easily gotten help and presumably kept watch. Id. at 580. The inconvenience and possibility of flight while applying for a warrant was not enough to constitute exigent circumstances justifying a warrantless entry and search. Id. at 580. Finally, the court noted that "probable cause here was not particularly strong." Id. at 579.

Huset's case is strikingly similar. The reason for Jorgenson's entry into Huset's apartment was his guess or mere suspicion that minors might be drinking. As in B.R.K., if the officers were concerned about flight of suspects, they could have easily waited outside to stop and investigate the individuals as they left Huset's apartment. As in B.R.K., there simply was no exigent circumstance involved, e.g., no hot pursuit, no emergency condition or danger to human life, no imminent destruction of evidence, and no real possible flight of suspects.

In B.R.K., the supreme court seemed to assume that probable cause existed, but that is not necessarily to be assumed in Huset's case. The facts plausibly lead to the inference that the officers were simply acting on mere a hunch, a guess. In part, their guess was based upon the fact that they heard someone say "oh shit, it's the cops" and some sort of commotion. It's also based on Jorgenson's word that he saw underage persons walk past the hallway carrying an alcoholic beverage. However, that critical fact is omitted from his

initial police report. It is not mentioned until a second report prepared because of the possibility of a lawsuit. That omission seriously tests the credibility of Jorgenson in this case. A jury could infer that the fact that a male and female were carrying what appeared to be alcohol was omitted from the police report is because that is not what happened. In other words, the jury may conclude that Jorgenson's subsequent report and testimony has been made up to help justify his actions that night.

Nonetheless, even if Jorgenson did see what he says, based upon B.R.K., that fact is not serious enough to allow him to enter absent exigent circumstances, which simply did not exist.

In light of B.R.K., no reasonable officer could have concluded that Jorgenson's actions were permissible. At the very least, fact questions exist about probable cause and the existence of exigent circumstances. Therefore, it is an open question as to whether qualified immunity applies, and summary judgment should be denied at this point.

## III. EXCESSIVE FORCE

Huset alleges that Jorgenson used excessive force, both when he initially entered the apartment (e.g., Huset was flung or thrown back against the wall) and when Huset was subsequently formally arrested.

The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person. Guite v. Wright, 147 F.3d, 747, 750 (8th Cir. 1988). Excessive force claims are properly analyzed

under the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 389, 109 S. Ct. 1865, 1867, 104 L. Ed. 2d 443 (1989). Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion of the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Graham, 490 U.S. at 396, 109 S. Ct. 1871.

Police officers are liable for the use of excessive force when they use force that is not objectively reasonable in light of the facts and circumstances confronting them. Goff v. Bise, 173 F.3d 1068, 1073 (8th Cir. 1999)(citing Graham, 490 U.S. at 389). Force can only be used to overcome physical resistance or threatened force. Agee v. Hickman, 490 F.2d 210, 212 (8th Cir. 1974), cert. denied, 417 U.S. 972 (1974). Moreover, the lack of provocation or the need to use force makes any use of force excessive. U.S. v. Harrison, 671 F.2d 1159, 1162 (8th Cir. 1982), cert. denied, 103 S.Ct. 104 (1982). And the use of excessive force is never reasonable. Jackson v. Crews, 873 F.2d 1105, 1108 (8th Cir. 1989). In assessing any claim of excessive force, the relevant facts to look at include the severity of the suspected crime, whether the suspect posed an immediate threat to the officer or others, and whether the suspect was actively resisting arrest. Goff, 173 F.3d at 1073. The issue before the Court is whether, in light of the circumstances, a juror could reasonably conclude that the force used against Huset was excessive. See Goff, 173 F.3d at 1074. Viewing the facts in the light most favorable to Huset, a fact questions exists

regarding whether the force used against him was excessive.

First, as discussed above, facts exist suggesting that Jorgenson did not have reasonable suspicion, much less probable cause, to even enter Huset's apartment. As a result, because Jorgenson was not authorized to Huset's apartment, he had no right to use force to enter. Because the use of any force is excessive when no force is called for, see U.S. v. Harris, 671 F.2d at 1162, Jorgenson's use here of any force is not reasonable.

Second, in light of B.R.K. and the facts confronting Jorgenson in Huset's case, no reasonable officer could have concluded that the entry, much less the use of force to make entry, was permissible. Despite the seriousness of underage drinking, as in B.R.K., it was not enough to allow police to even enter, much less arrest anyone.

Next, Huset states facts to suggest he posed no danger to the officers or others - - some testimony suggests Huset remained calm throughout. The defendants suggest that even if they had entered illegally, Huset had an affirmative duty to submit to their authority and commands, including Jorgenson's demand that Huset go out into the hallway with him. First, that is irrelevant. See Goff, 173 F.3d at 1075-76 (whether one has a duty to submit to a lawful arrest is plainly irrelevant to the issue of whether the officer used excessive force in effecting that arrest).

Second, the duty to follow police commands is not absolute. For instance, Huset had no duty allow the police into the home - - he was not required to give consent - - upon their request (without a warrant) to enter. Nor did Huset have a duty to walk into the

hallway when the officers first appeared at his door had they so requested at that time. Instead, the key in this case is whether there is evidence of resistance and the nature thereof. Id. at 1076. Hence, the Court must consider the nature of Huset's refusal in light of all the circumstances, which in this case are revealing.

First, the officers were inside his apartment illegally and they had already committed egregious violations of Huset's constitutional rights by invading his home without a warrant. Second, they had already used force in invading his home and by dragging him to another room. Then, they had brought him to the hallway of his apartment, thereby removing him from his guests. Under these conditions, Huset feared for his safety and what might happen next. He was not yet formally arrested and wanted to stay within the confines of his home, his castle, his fortress.

Quite simply, saying "no" to the command to leave the apartment and go into the hallway and just standing there did not warrant the level and amount of force used by Jorgenson to then effectuate Huset's arrest.

Under the facts, a jury might easily conclude that the use of force used against Huset in throwing him across his kitchen and onto the floor and then arresting him in the violent manner Jorgenson did was excessive. The facts suggest that such force was not necessary to arrest him, but was instead punish Huset. The officers mocked Huset by calling him a "little rock star." The officers also stated that he needs to grow a few inches and that they were going to teach him a lesson. These facts, combined with Huset's

testimony that he did not take a combative stance in the hallway, will allow a fact-finder to draw the inference that the level and amount of force used to arrest Huset was not necessary and, therefore, excessive.

At a minimum, fact issues persist as to the need for force and the amount used. Summary judgment at this point would not be appropriate.

## IV. COMMON LAW EXCESSIVE FORCE (ASSAULT/BATTERY)

Defendants assert that they are immune from Huset's common law excessive force or assault and battery claims. The analysis here is similar qualified immunity.

Where public duties call for the exercise of professional judgment or discretion, government officials are entitled to immunity from state claims unless the officials are guilty of a willful or malicious wrong. See Pletan v. Gaines, 494 N.W.2d 38, 40 (Minn. 1992). The doctrine of official immunity bars liability unless a plaintiff proves that a police officer willfully violated a known right. Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991). This narrow exception applies when an officer intentionally commits an act that he or she had reason to believe is prohibited. Id. at 107. Questions of official immunity, too, are an appropriate resolve by summary judgment. Id. An assault is a threat to do bodily harm to another with the present ability to carry it out. Dahlin v. Fraser, 206 Minn. 476, 288 N.W. 851 (1939). A battery is an intentional, unpermitted, offensive contact with another. Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980). Police officers may come into contact with individuals, thus, the use of

force must be excess to constitute a battery. Adewale v. Whalen, 21 F.Supp. 1006, 1016 (D.Minn. 1998) (citing Johnson v. Peterson, 358 N.W.2d 484, 485 (Minn.Ct.App. 1984)).

Huset reiterates that the facts upon which his assault and battery claims are made are largely those described on the subject of qualified immunity. Huset submits that there are material facts that preclude summary judgment on his assault and battery claims. As with the analysis above, it is an open question in this case whether a reasonable officer, faced with the facts and circumstances that existed on January 1, 2004, would have known that the entry of Huset's apartment and his seizure and arrest were not warranted under law, thereby making any use of force excessive. Summary judgment would be inappropriate at this time. See Adewale, 21 F.Supp. at 1016 (factual disputes concerning excessive force in qualified immunity is enough to overcome official immunity defense on assault and battery claims).

V. HUSET'S ILLEGAL SEIZURE AND ARREST ITSELF

Defendants suggest that despite all the illegalities that preceded it, Jorgenson's command that Huset step into the hallway had to be complied with. Defendants further suggest that when Huset refused, Jorgenson then had grounds to arrest Huset for obstruction. Huset challenges this, asserting that Jorgenson had no ground to arrest him.

First, it is well established that the Fourth Amendment gives citizens the right to not be arrested without probable cause. See Goff, 173 F.3d at 1072. Probable cause exists when the totality of circumstances demonstrates that a prudent person would believe that

the arrestee had committed a crime. Kuehl v. Burris, 173 F.3d 646, 650 (8th Cir. 1999). Although law enforcement is to be given substantial latitude in interpreting and drawing inferences from factual circumstances, that latitude is not without limits. Id. Because the totality of circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause. Id. "Whether an official could be expected that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." Ludwig v. Anderson, 54 F.3d 465, 474 (8th Cir. 1995) (citations omitted).

Under the facts and circumstances alleged by Huset, a material question exists as to whether a reasonable officer would have concluded that he had probable cause to seize and arrest him for obstruction.

The defendants' primary argument is that Huset's refusal to go in the hallway, together with the physical stance he took when refusing, was obstruction and that Jorgenson then had the right to arrest him. As alluded to above, the duty to submit quietly to a police command is not absolute. The key is to look at the nature of Huset's refusal in light of all the circumstances. In this case, Huset's refusal was not obstruction, but simply his effort to protect himself from further misconduct of the officers. State v. Washington, 270 A.2d 282 (N.J. 1970) is instructive.

In Washington, the New Jersey supreme court found that an arrestee's duty to

submit quietly is not controlling when an officer undertakes to use unnecessary or excessive force to make an arrest. In that case, the arrestee is justified in employing force to protect himself, and if the officer is hurt because of that, there is no crime. Washington, 278 A.2d at 283. As with the police, an arrestee cannot use more force than is necessary. Id. Under the facts of the case in Washington, the supreme court found that the arrestee's action were protective versus aggressive. Id.

Under Huset's facts, his resistance by saying "no" to the officers' commands to leave the apartment and step into the hallway, out of the safe confines of his apartment, was protective. Recall that Huset had already been assaulted when the officers entered the apartment. The officers had refused Huset's legal refusal to allow them entry, and they had searched his apartment illegally. They had then removed him from the sight of his guests. Huset simply had no idea what Jorgenson planned to do next, but feared it would not be pleasant - - as it was, he was right.

At this point, Huset's actions were more akin to those to the arrestee in State v. Washington, and any resistance was not a crime, but was his own self defense. At that point, any officer would have similarly known that.

Up to this point, under the circumstances, you could also say that Huset's refusal to step into the hallway was his protest against illegal government conduct. In other words, his saying "no" was protected speech under the First Amendment, not unlike saying "f*** you, pigs." See Cohen v. California, 403 U.S. 15, 26 (1971)("f*** the draft"

moniker on a jacket or shirt was protected speech, not criminal behavior). The officers may not have liked it, but there was no need at that point to remove Huset from his home.

Finally, as suggested above, one could further conclude that the real reason for the arrest was not because Huset had committed any crime, but because he had simply stood up and called the officers on their illegal, unconstitutional behavior in front of Huset's guests. Certainly, Jorgenson may not have liked that and, as a result, sought to teach Huset a lesson. The point is, Huset legitimately called Jorgenson to the carpet for his unconstitutional behavior and Jorgenson clearly did not like it. He must have felt that Huset's actions and statement were an affront to his authority. To save face, Jorgenson asserted himself excessively and arrested Huset.

Taking into account all the facts circumstances, there is a factual dispute about whether grounds existed for Huset's arrest. At this point, summary judgment would be inappropriate.

## CONCLUSION

For the foregoing reasons, Mr. Huset respectfully asks that the defendants' motion for summary judgment be denied and that this case be put on this Court's trial calendar.

Respectfully submitted,

Dated: April 13, 2006

SJOBERG & TEBELIUS, P.A.

By: s/Scott Swanson
Scott W. Swanson (#241283)
2145 Woodlane Drive, Suite 101
Woodbury, MN 55125
(651) 738-3433

APPLEBAUM LAW FIRM
Paul Applebaum (#223098)
First National Bank Building
332 Minnesota Street, Suite W1610
St. Paul, Minnesota 55101
(651) 222-2999

Attorneys for Plaintiff
Jesse Huset